RECEIVED
AUG 2 2 2023
AT 8:30 _____ M
CLERK, U.S. DISTRICT COURT - DNJ

SMS/2023R00187

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp |
| v. | : | Criminal No. 23-675-01 (MAS) |
| PATRICK FITCHNER | : | 18 U.S.C. § 1349 |

## INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud)

1. Unless otherwise indicated, at all times relevant to this Information:

**Relevant Individuals and Entities**

a. Defendant PATRICK FITCHNER was a resident of Florida. Defendant FITCHNER and STEVE CHICOYE, a co-conspirator not charged in this Information, owned and operated a company (the "Supply Company") through which defendant FITCHNER, CHICOYE, and others engaged in the health care fraud kickback scheme described below.

b. ALEXANDER SCHLEIDER ("SCHLEIDER"), a co-conspirator not charged in this Information, was a resident of New Jersey. SCHLEIDER owned, operated, and had a financial or controlling interest in multiple durable medical equipment ("DME") supply companies, including DME Company-1 and DME Company-2 (collectively, the "DME Companies"). The DME Companies

primarily supplied DME such as knee, ankle, back, wrist, and shoulder braces to Medicare beneficiaries and beneficiaries of commercial health care benefit programs.

### Background on the Medicare Program

c.  Medicare was a federally funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who receive benefits under Medicare were referred to as "Medicare beneficiaries."

d.  Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

e.  Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

f.  Medicare Part B covered non-institutional care that included physician services and supplies, such as DME, that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

g.  Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

h.  In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment,

2

Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

i. As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as the Federal Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. The Medicare Form CMS-855S also required that those with an ownership interest in the DMEPOS supplier disclose, among other things, any federal convictions within the preceding ten years.

j. Medicare-authorized suppliers of healthcare services and supplies, such as DME, could only submit claims to Medicare for reasonable and medically necessary services. Medicare did not reimburse claims for services that it knew were procured through kickbacks or bribes. Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and

3

program instructions, as well as federal criminal law. For example, where a prescription for DME was procured through the payment of a kickback in violation of the AKS, a claim to Medicare for reimbursement for that DME was fraudulent. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for those elderly and other qualifying beneficiaries who had a genuine need for medical services.

### **Telemedicine**

k.  Telemedicine allowed health care providers, such as physicians, to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient.

l.  Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits.

m.  Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

**The Conspiracy**

2. From at least as early as March 2020 through in or around June 2021, in the District of New Jersey, and elsewhere, defendant

**PATRICK FITCHNER**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

**Goal of the Conspiracy**

3. The goal of the conspiracy was for defendant FITCHNER and others to profit by submitting or causing the submission of false and fraudulent claims for DME to federal and commercial health care benefit programs.

**Manner and Means of the Conspiracy**

4. The manner and means by which defendant FITCHNER and others sought to accomplish the goal of the conspiracy included, among other things, the following:

    a. Defendant FITCHNER agreed with SCHLEIDER and others to defraud health care benefit programs by soliciting and receiving kickbacks and bribes from SCHLEIDER and others in exchange for providing the DME

Companies with completed doctors' orders for medically unnecessary DME ("DME Orders"). The DME Order were subsequently fraudulently billed to Medicare and other health care benefit programs.

   b. As the term was used during the conspiracy, a DME Order contained the name of a patient with federal or commercial insurance coverage, the patient's contact information, insurance details, and a doctor's order or prescription for DME for that particular patient.

   c. Generally, defendant FITCHNER generated DME Orders by identifying qualified beneficiaries located in New Jersey and elsewhere using marketing call centers under his direction. Once beneficiaries were identified, defendant FITCHNER and his co-conspirators used telemedicine companies to secure DME Orders, regardless of medical necessity.

   d. After obtaining the DME Orders, defendant FITCHNER transmitted and caused to be transmitted the DME Orders to the DME Companies. After receiving the DME Orders from defendant FITCHNER, SCHLEIDER (through the DME Companies) arranged for the DME, such as orthotic braces, to be shipped to individual beneficiaries. Finally, SCHLEIDER (through the DME Companies) submitted or caused the submission of claims to Medicare and other federal and commercial health care benefit programs from New Jersey and elsewhere for payment for each of the DME Orders.

   e. Defendant FITCHNER and his co-conspirators received kickbacks for each DME Order that resulted in reimbursement from a health care benefit program. Specifically, SCHLEIDER entered into kickback

agreements to pay defendant FITCHNER kickbacks ranging from approximately $100 to $300 in exchange for each DME Order depending upon the type of brace ordered.

    f.    Defendant FITCHNER and his co-conspirators knew that the claims to Medicare and other federal and commercial health care benefit programs for each DME Order were fraudulent because they were (i) procured through the payment of kickbacks and bribes and therefore not eligible for federal reimbursement; (ii) medically unnecessary; and/or (iii) approved by providers who did not treat the beneficiary.

    g.    To conceal the nature of the kickback arrangement, defendant FITCHNER and his co-conspirators entered a sham contract with defendant SCHLEIDER (the "Sham Agreement"). The Sham Agreement falsely stated that the Supply Company was engaged in marketing services for the DME Companies and provided, among other things, that the Supply Company would provide the DME Companies with "raw leads," not DME Orders. The Sham Agreement provided that the Supply Company would be paid a "fixed annual fee" and also would be paid based on "Marketing hours." The Sham Agreement did not reveal that, in fact, the Supply Company was being paid kickbacks per DME Order.

    h.    To further conceal the nature of the kickback payments, defendant FITCHNER and his co-conspirators submitted sham invoices to the DME Companies that intentionally mischaracterized the nature of the payments sought. Specifically, the invoices that defendant FITCHNER and his co-conspirators sent the DME Companies for marketing falsely billed on an hourly

basis, when, in reality, the payments were being made on a per-DME-Order basis.

    i. Through the scheme, defendant FITCHNER and his co-conspirators received at least approximately $2,189,904 for DME Orders from SCHLEIDER. As a result of defendant FITCHNER's participation in the health care fraud scheme, Medicare and other federal and commercial health care benefit programs paid the DME Companies at least approximately $3,691,303.67 for DME Orders that were the product of the illicit scheme.

  All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

1.  Upon conviction of the Federal health care offense alleged in this Information, defendant FITCHNER shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, defendant FITCHNER obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense, which was at least approximately $2,189,904, and all property traceable to such property.

## SUBSTITUTE ASSETS PROVISION
## (Applicable to All Forfeiture Allegations)

2.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third person;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c).

*Philip R. Sellinger*
PHILIP R. SELLINGER
United States Attorney

**CASE NUMBER: 23-675-01 (MAS)**

**United States District Court
District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**PATRICK FITCHNER**

**INFORMATION FOR**

**18 U.S.C. § 1349**

PHILIP R. SELLINGER
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

SEAN M. SHERMAN
*ASSISTANT U.S. ATTORNEY*
*973-645-2733*